# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS and DAN BECKER, | CV 05-555-KI |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| UNITED STATES FOREST SERVICE, | |
| Defendants, | |
| and | |
| D.R. JOHNSON LUMBER CO., an Oregon corporation, | |
| Intervenor-Defendants. | |

**Marianne G. Dugan**
Attorney at Law
259 E. 5th Ave., Suite 200-D
Eugene, OR 97401
(541) 338-7072

**Marc D. Fink**
Western Environmental Law Center
612 Alworth Building
306 West Superior St.
Duluth, MN 55802
(218) 722-4130
    Attorneys for Plaintiffs

1 – OPINION AND ORDER

**Jeffrey K. Handy**
United States Attorney's Office
1000 SW Third Avenue Portland, OR 97204-2902
(503) 727-1013

**Rachel Anne Dougan**
US Department of Justice
P.O. Box 663
Washington, DC 20044-0663
(202) 616-5082

**Stephen J. Odell**
United States Attorney's Office
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204-1024
(503) 727-1024

       Attorneys for Defendant

**Scott W. Horngren**
**Julie A. Weis**
Haglund Kelley Horngren Jones & Wilder LPP
1800 One Main Place
101 S.W. Main Street
Portland, OR 97204-3226
(503) 225-0777

       Attorneys for Intervenor-Defendant

KING, Judge:

    On August 4, 2005, the court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction and temporary restraining order (doc. 6),[1] and amended motion for bond waiver (doc. 12). For the following reasons, I deny plaintiffs' motion for preliminary injunction and temporary restraining order and, accordingly, I deny as moot plaintiffs' amended motion for waiver of bond.

---

[1] The parties agreed that I should issue a ruling as to the temporary restraining order and preliminary injunction requests simultaneously.

## BACKGROUND

In 2002, the "Easy Fire" burned almost 6000 acres of forest land located in the Malheur National Forest near Prairie City in Eastern Oregon. In response to the fire loss, the Forest Service developed the "Easy Fire Recovery Project" for purposes of capturing the economic value of dead and dying trees, re-vegetating the project area, reestablishing burned old-growth areas, reducing dead standing and downed fuel, and reducing road-related impacts on wildlife.

On September 15, 2004, the Forest Service issued an Environmental Impact Statement (EIS) assessing the impact of the project on the environment and outlining 5 alternative courses of action. On September 28, 2004, the Forest Service issued a Record of Decision (ROD) implementing alternative 3, which includes, inter alia, the removal of those trees killed by the fire, and those trees expected to die as a result of the fire, by means of a timber salvage sale. The Forest Service immediately began the process of surveying and marking trees that met the criteria for harvest, and ultimately identified a total sale area for salvage of dead and dying trees encompassing 1251 acres, involving approximately 6.3 million board feet of timber. To determine which trees were dead and dying, the Forest Service relied on the "Scott Guidelines."

On August 1, 2005, the Forest Service awarded the timber salvage sale to intervenor-defendant D.R. Johnson Lumber Company, which made the higher of two bids for the sale.[2]

On April 22, 2005, plaintiffs brought this action alleging the Forest Service violated the National Forest Management Act (NFMA), 16 U.S.C. § 1600, et seq. by issuing the ROD implementing Alternative 3. In addition, plaintiffs allege the Forest Service violated the National

---

[2] As of the date of the hearing, the sale area was reduced to 736 acres, involving 4.6 million board feet of timber.

Environmental Policy Act (NEPA), 42 U.S.C. § 4321, et seq, by failing to disclose in the EIS for the project the opposing views of credible scientists who challenged the validity of the Scott Guidelines.

## STANDARDS

**Judicial Review under the Administrative Procedure Act.**

Judicial review of agency decisions under both NEPA and NFMA is governed by the APA, which specifies that an agency action may be overturned only where it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir.1998) (applying arbitrary and capricious standard to NEPA and NFMA claims).

Review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency. Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matter." United States v. Alpine Land and Reservoir Co., 887 F.2d 207, 213 (9th Cir. 1989), cert. denied, 498 U.S. 817 (1990).

"An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation ." Wards Cove Packing Corp. v. National Marine Fisheries Service, 307 F.3d 1214, 1218 (9th Cir. 2002). In other words, if "the meaning of [regulatory] language is not free from doubt--i.e., is ambiguous--the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to

the purpose and wording of the regulations." Providence Health System-Washington v. Thompson, 353 F.3d 661, 665 (9th Cir. 2004). "The deference required depends on the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade." Omohundro v. U.S., 300 F.3d 1065, 1068 (9th Cir. 2002)

**Injunctive Relief.**

Plaintiffs are entitled to a temporary restraining order if they demonstrate "(1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in [their] favor." Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir.1994) (citing Fund for Animals v. Lujan, 962 F.2d 1391, 1400 (9th Cir.1992)). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir.1998) (quoting United States v. Nutri-cology, Inc., 982 F.2d 394, 397 (9th Cir.1992)). Plaintiffs, as the parties seeking injunctive relief, bear the burden of demonstrating these factors justifying relief by clear and convincing evidence. See Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 441 (1974).

"Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." Forest Conservation Council v. U.S. Forest Serv., 66 F.3d 1489, 1496 (9th Cir.1995). The Supreme Court has held insufficient evaluation of environmental impact under NEPA does not create a presumption of irreparable injury. Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). However, the Court also observed "[e]nvironmental injury, by its nature, can seldom be adequately remedied

by money damages and is often permanent or at least of long duration, i.e., irreparable." Idaho Sporting Congress Inc. v. Alexander, 222 F.3d 562, 569 (9th Cir.2000) (citing Amoco, 480 U.S. at 545). Therefore, "when the environmental injury is 'sufficiently likely,' the balance of harms will usually favor the issuance of an injunction to protect the environment." Id.

## DISCUSSION

The heart of the dispute is that the Forest Service has marked for timber salvage trees with diameters greater than 21" at breast height that still show signs of life, thereby giving rise to two related issues: (1) Whether the Forest Service's wildlife standards in the "Eastside Screens" governing timber salvage sales in the Malheur National Forest preclude the logging of live trees, even though the trees may be dying, and (2) if not, whether the Forest Service's use of the Scott Guidelines to determine tree mortality in connection with the timber salvage sale was arbitrary and capricious.

**The Eastside Screens.**

Under the NMFA, the Forest Service has adopted Land and Resource Management Plans for National Forests. For nine of them, including the Malheur National Forest located east of the Cascade Range, the Forest Service has adopted "Eastside Screens"[3] to provide wildlife standards. One of the standards in the Eastside Screens is that "timber harvest[s]" shall "[m]aintain all remnant late and old seral and/or structural live trees $\leq$ 21" dbh that currently exist within stands proposed for harvest activities." See Def's. Mem., Ex. B, Appendix B, p. 10 .

---

[3] The "Eastside Screens" are set forth in the Forest Service's "Environmental Assessment for the Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales," Appendix B, June, 1995.

Plaintiffs assert the term "live trees" is unambiguous and means that no tree 21" or more in diameter at breast height can be logged if it shows signs of life, i.e., is green or otherwise not dead. Plaintiffs assert "[a]lthough the Forest Service categorizes many of the marked trees as 'dying,' the plain meaning of 'live' is still living, in other words, not dead." Plf.'s Mem., p. 6.

To support this position, plaintiffs rely on two recent opinions from this district issued in League of Wilderness Defenders-Blue Mountains Biodiversity Project v. Smith, CV 04-1595 and CV 04-1628 (consolidated) (DOWD), in which the court has addressed the applicability of the Eastside Screens wildlife standards to the High Roberts timber salvage sale, also in the Malheur National Forest.

In an opinion issued on December 9, 2004, I concluded that the plaintiffs were likely to prevail on their claim that the Forest Service was improperly permitting the removal of "live" rather than "dead" trees in the High Roberts salvage sale. I stated:

> [P]laintiffs have made a strong showing on their NFMA claims. The Eastside Screens prohibit the logging of "live" trees greater than 21 inches in diameter at breast height. Although the Forest Service categorizes many of the marked trees as dying, the plain meaning of "live" is still living, in other words, not dead. Plaintiffs have presented evidence, which the Forest Service has not rebutted, that numerous trees marked for cutting are alive and greater than 21 inches in diameter at breast height. . . . The Forest Service has not provided any reason why the "dead or dying" language takes precedence over the "live" language in the Eastside Screens.

Opinion at 10 (emphasis added).

In a subsequent order issued on January 6, 2005, Judge Jones granted the plaintiff's motion for a preliminary injunction barring the Forest Service from awarding the salvage sale unless the Forest Service marked "the sale for harvest only of (1) trees that are demonstrably dead or (2) trees that are <u>dead or dying</u> or are 21 inches or less dbh." Judge Jones explained that, "[f]or purposes of this order, a tree is 'live' if it has any green needles or, for 'western larch,' one viable bud." Preliminary Injunction at 2.

Here, the Forest Service has brought to my attention for the first time evidence that since at least September 1998, it has interpreted "snags," <u>i.e.,</u> dead trees that remain standing, to include "dying" trees.[4] At that time, in advice to Forest Service employees in the Silver Lake and Paisley Ranger Districts, the Forest Service stated "dying trees can be counted as snags if there is a professional determination that the tree will definitely be dead within 5 years." Def.'s Mem., Ex. E.2, p. 3. The Forest Service explains why it has adopted that interpretation:

> The Forest Service's interpretation of the wildlife standard [in the Eastside Screens] is wholly consistent with the standard's purpose. The prohibition on the harvest of 'live' trees greater or equal to 21" dbh was not intended to restrict the salvage of fire-injured trees that are dying or dead. . . . [T]he intent of the wildlife section in the Eastside Screens is to ensure the conservation of live forested "late and old structure" habitat for certain species. . . . A fire-injured tree that is not expected to survive cannot contribute to LOS habitat over the long term. As the FEIS explains '[a]lthough trees may still provide cover or canopy habitat today, the condition is expected to be short-lived, only up to five years.'

<u>Id.</u> at 14-15; <u>See also</u> Ex. A., FEIS, at 113.

---

[4] The Forest Service acknowledges that it has not previously explained its reasoning for distinguishing between "live" trees and "dead or dying" trees to this court.

8 - OPINION AND ORDER

At the hearing, Forest Service silviculturist Tim Kincaid testified that the salvaging of fire burned trees that were dying but not yet dead is also beneficial to the forest because it avoids the need to reenter the area to remove the trees after they finally die. Reentry often results in adverse impacts such as soil compaction and damage to surrounding live trees.

As noted, the Forest Service's interpretation of its own regulations, including the wildlife standards set out in the Eastside Screens, is entitled to deference. I conclude that its interpretation of dead trees to include those that are dying and will be dead within five years is reasonable and, therefore, not arbitrary and capricious. Accordingly, I conclude the Eastside Screens wildlife standards do not preclude the Forest Service from salvaging fire-burned trees with diameters equal to or greater than 21 inches at breast height, as long as a reasonable determination is made beforehand that the trees will die within five years.

**The Scott Guidelines.**

The remaining issue is whether the use of the Scott Guidelines to make that determination is arbitrary or capricious.[5]

In 2002, Donald Scott, a Forest Service Entomologist, was the lead author of guidelines for determining whether it was likely a tree would die from the effects of a forest fire. See <u>Factors affecting survival of fire injured trees: a rating system for determining relative probability of survival of conifers in the Blue and Wallowa Mountains</u>. Def's Mem., Scott Decl., ¶ 3; and Exs.

---

[5] I addressed the Scott Guidelines in my opinion in <u>DOWD</u> only in the context of their application to the Forest Service's decision that the High Roberts salvage sale was subject to a categorical exclusion. I rejected the plaintiffs' challenge that the Scott Guidelines were not entitled to the degree of deference usually afforded administrative agencies with respect to scientific matters. See <u>Opinion</u> at 9 (issued Dec. 9, 2004).

9 – OPINION AND ORDER

B-J.[6]  The Scott Guidelines categorize fire-damaged trees by their probability of survival, i.e., "high," "moderate," and "low."  Scott acknowledges that while those trees in the "high" and "low" categories can be assessed with some degree of accuracy, "moderately" damaged trees are the "most difficult to assess."  A "rough estimate" is that 50% will survive and 50% will not.  In determining the likelihood of survival, an important factor is the extent of burn damage at the base of the tree. Trees with only 25% damage have a high probability of surviving, while those with 75% damage have a low probability of surviving.  Id., ¶ 25.  Scott also concludes the extent of root damage associated with dead cambium (root cells) is a predictor of tree mortality.  Id., ¶¶ 35-37.

Scott testified at the hearing that, to test his guidelines, he has inspected fire-burned trees in the Easy Fire and the Monument Fire locales in the Malheur National Forest and, based on that inspection, found the guidelines accurately predict mortality for most species.  He testified, however, the guidelines underestimated mortality for lodge pole pine and overestimated mortality for grand firs and white firs.

In November 2004, Scott visited the Easy Fire timber salvage area specifically to check the ≥21" diameter dbh trees that had been marked for salvage based on his guidelines to determine the accuracy of the markings.  He found the marking crews were correctly applying his guidelines and the markings were appropriate.

Plaintiffs argue the Scott Guidelines are not a reasonable predictor of tree mortality and the science supporting the guidelines is not reliable.  In support of this argument, plaintiffs have

---

[6] Scott's work has been peer reviewed.  Def.'s Mem., Ex. D.

submitted comments to the Forest Service and this court from "leading scientists" to the effect that the Scott Guidelines are "pseudoscience."

I have reviewed plaintiff's evidentiary submissions addressing science issues and find them unpersuasive.

Andy Stahl, Executive Director of plaintiff FSEEE, has submitted a declaration that incorporates critical "comments" from purported scientists (without attached curricula vitae) who have reviewed the Scott Guidelines. Their comments are hearsay, are not authenticated, and are admittedly "guesses," "quick looks, " and "suggest[ions]." Although I have received the comments into evidence, I give them little or no weight.

Dan Becker, a former assistant district fire management officer for the Prairie City Ranger District, submitted a declaration attaching a number of photographs purporting to depict fire damaged trees that, although marked for salvage, are alive, or at least, show signs of life. The photographs are not helpful because the issue is not whether a tree is still alive, but whether the tree will be alive in five years. In addition, Becker's declaration includes the same comments by the purported scientists that are included in the Stahl declaration.

Finally, Bill Ferrell, a professor in the Forest Management Department at Oregon State University declares he has reviewed the photographs attached to the Becker declaration and concludes "they have survived the fire."

On this record, I find plaintiffs have not met their burden of demonstrating they are likely to prevail on the merits of their NFMA claim and, therefore, they are not entitled to injunctive relief.

Plaintiffs' NEPA claim is based on the Forest Service's alleged failure to respond in the EIS to scientific criticism of the Scott Guidelines. The record, however, reflects the scientific criticism is comprised of the same comments included in the Stahl and Becker declarations, which I have found unpersuasive, both as to form and substance. For purposes of the motions for injunctive relief before the court, I find it is no more likely that plaintiffs will prevail on their NEPA claim than they will prevail on their NFMA claim.

Moreover, I find that, although there is a possibility of irreparable injury if a living tree of $\leq$ 21" dbh is harvested, the Forest Service and defendant-intervenor D.R. Johnson have established that there is also a potential for irreparable injury if the timber salvage sale does not proceed in a timely manner. On this record, I find plaintiffs have failed to prove by clear and convincing evidence that the balance of hardships tips in their favor.

## **CONCLUSION**

For these reasons, the court denies plaintiffs' motion for a preliminary injunction and temporary restraining order (doc. 6) and, therefore denies as moot plaintiffs' amended motion for bond waiver (doc. 12).

IT IS SO ORDERED.

DATED this   11th   day of August, 2005.

    /s/ Garr M. King
Garr M. King
United States District Judge